# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

**SUSAN LIVELY,**

    Plaintiff**,**

      v.

**TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA,** a New York non-profit Corporation

    Defendant

Case No.

*Jury Trial Demanded*

## COMPLAINT

This action involves claims for religious discrimination under Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. 2000e-2 et seq., and the North Carolina Equal Employment Practices Act ("**NCEEPA**"), N.C. Gen. Stat. Ann. § 143-422.2.

## I. INTRODUCTION

1.    This lawsuit is the result of Defendant, Teachers Insurance and Annuity Association of America's ("**TIAA**" or "**Defendant**") illegal conduct relating to the denial of Plaintiff Susan Lively's ("**Ms. Lively**" or "**Plaintiff**") religious exemption request to Defendant's COVID-19 vaccine mandate ("**the Mandate**").

2.    After Ms. Lively submitted a religious exemption request outlining the religious sincerity of her beliefs in conflict with the Mandate, Defendant failed to engage in any interactive process calculated toward accommodating Ms. Lively's religious beliefs. Had it performed an even cursory attempt at locating a reasonable accommodation, Defendant would have discovered a menu of low-cost and no-cost options available (including maintaining the status quo of telework).

3.     Instead, Defendant terminated Ms. Lively, defending its decision on "workplace safety" grounds, at a time it knew the vaccines it mandated were incapable of preventing infection and transmission of COVID-19 and, at best, provided an undefined level of personal protection.

4.      In any event, due to the fact Ms. Lively was teleworking, Defendant's workplace safety rationale is nonsensical, even if its counterfactual assumptions regarding vaccine efficacy were accepted.

5.     In short, Defendant terminated Ms. Lively for upholding her religious convictions and refusing a medical treatment that possibly provided an undefined, unclear level of personal protection, and nothing more.

6.     For these reasons and the reasons more fully outlined below, Defendant violated the Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. 2000e-2, and consequently, the North Carolina Equal Employment Practices Act ("**NCEEPA**"), N.C. Gen. Stat. Ann. § 143-422.2.  Defendant's unlawful actions resulted in significant financial, reputational, emotional, and psychological harm to Ms. Lively.

## II. PARTIES

7.     Plaintiff Susan Lively is a resident of North Carolina, residing in Huntersville, North Carolina.

8.     Defendant TIAA is non-profit corporation with its principal place of business in New York, New York. Defendant has four major offices across the country, including TIAA's Charlotte, North Carolina campus, where the decisions relating to Ms. Lively's termination were made and records related to same are kept. At all relevant times hereto, TIAA employed more than 501 persons.

## III. JURISDICTION AND VENUE

9.     This Court has original jurisdiction pursuant to 28 U.S.C. §1331 as one arising under laws of the United States.  *See* 28 U.S.C. §1331.

10.     This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, et. seq.

11.     This Court has personal jurisdiction over Defendant because Defendant has substantial connection, sufficient minimum contacts in North Carolina.

12.     Venue is proper in the Court under 42 U.S.C. § 2000e-5(f) for several independent reasons. The "unlawful employment practices" giving rise to this lawsuit took place within this district; the "employment records relevant to such practice" are maintained and administered in this district; and Ms. Lively would have continued to work in this district, but for Defendant's unlawful actions.

## IV. FACTUAL ALLEGATIONS

### *General Background*

13.     In March 2020, the Severe Acute Respiratory Syndrome Coronavirus 2 ("**SARS-CoV-2**"), the disease commonly referred to as "COVID-19," prompted the institution of worldwide lockdowns in an effort to slow the spread of COVID-19.

14.     On March 13, 2020, then President Donald J. Trump declared a national emergency relating to the COVID-19 pandemic.  In response, many state and local governments issued "Stay at Home" orders for all non-essential workers, urging residents only to leave their homes for necessities.

15.     In response, many state and local governments issued "Stay at Home" orders for all non-essential workers, urging residents only to leave their homes for necessities.  This resulted in

corporations, like Defendant, shifting all non-essential workers to remote work and utilizing teleconferencing platforms like Zoom and Microsoft Teams as replacements for in-person meetings.

***Plaintiff's Employment Background***

16.     In or about November 2008, Ms. Lively began her career with Defendant.

17.     After earning a strong performance record, she eventually gained the title of Senior New Account Coordinator in the Financial Planning & Central Advice Group (the "**CAG**" department).

18.     After employees, including Ms. Lively, were sent home from their respective offices to telework as a result of the pandemic, Ms. Lively's essential job duties did not require in-person contact during the relevant timeframes. While teleworking, Ms. Lively's job did not require her to interface with clients or colleagues.

19.     At all times relevant hereto, Ms. Lively was able to perform the essential duties of her job entirely remotely, as evidenced by the fact that she worked in a fully remote capacity from March of 2020 until Defendant terminated her employment.

20.     Ms. Lively performed her job duties exceptionally well and received annual, merit-based bonuses during her employment with Defendant.

21.     Ms. Lively performed all her essential job duties remotely after she was instructed to do so.

22.     If Defendant had not terminated her, Ms. Lively could have continued to perform her essential job duties in a fully remote capacity at low cost or without any cost whatsoever to Defendant.

4

***Defendant's Vaccination Mandate and Plaintiff's Religious Beliefs in Conflict with the Mandate.***

23.     On November 15, 2021, Defendant issued its COVID-19 vaccine mandate, requiring all employees to receive a COVID-19 vaccine by March 1, 2022.

24.     Defendant advised that medical and religious accommodations to the Mandate would be available if an exemption request was submitted and ultimately granted.

25.     Ms. Lively is a Christian. She has sincerely held religious beliefs in conflict with receiving a COVID-19 vaccine.

26.     Due to her religious beliefs, Ms. Lively was unable to comply with the Mandate.

27.     Ms. Lively believes that engaging in activity that would possibly alter her DNA would be a sin.[1]

28.     Ms. Lively sincerely believes that receiving a COVID-19 vaccine would alter her DNA, which in her system of religious beliefs, would fundamentally alter God's perfect design for her body and her life. In her personal system of religious beliefs, to engage in such activity would be to violate God's design and intent for her life and as such would be a sin.[2]

29.     Accordingly, Ms. Lively timely submitted her religious exemption request on December 15, 2021 explaining her religious conflict with the Mandate.[3]

30.     More specifically, Ms. Lively relied upon Psalms 139:13-16 in her religious exemption request, which reads, "Your eyes saw my embryo, and on your scroll every day was written that as being formed for me."[4]

---

[1] *See* Exhibit A, Plaintiff Religious Exemption Request.

[2] *Id*.

[3] *Id*.

[4] *Id*.

31.     Ms. Lively cited numerous other Bible passages detailing her religious system of beliefs and why and how these beliefs created conflicts with receiving a COVID-19 vaccine.

32.     Ms. Lively's religious conflict with the Mandate stems from her belief that God created her DNA and immune system and that she cannot affirmatively and knowingly do something that would alter her DNA. Ms. Lively explained, "God formed my DNA before I was born. Taking this synthetic mRNA will change the DNA that God created for me."[5]

33.     Ms. Lively has never been forced to undergo a medical procedure whereby she would potentially alter her DNA.  If she had been confronted with such a situation, or in the future is ever confronted by a similar scenario, she would have declined and will decline undergoing the procedure based on her sincerely held religious beliefs.

34.     For religious reasons, Ms. Lively is very wary of many medical products and as such refrains from taking a variety of medicines.  The few medicines that Ms. Lively takes do not conflict with her religious beliefs.

35.     Because the issue of God's perfect design is of deep importance to Ms. Lively, Ms. Lively took very seriously reports and studies indicating that one's DNA would realistically be altered by the COVID-19 vaccines. When dealing with religious issues implicating God's design, Ms. Lively errs on the side of caution.

36.     To require her to violate her firmly held convictions against altering her DNA substantially burdened Ms. Lively's religious convictions.

37.     Ms. Lively is personally unaware of any other medicines or products she has ever used that may alter her DNA. If made aware that any such product would potentially alter her

---

[5] *Id*.

DNA, she would not use them and would immediately cease using them based on her religious convictions.

38.     Ms. Lively also has religious objections to receiving a COVID-19 vaccine based on her religious objections to abortion.  Ms. Lively objects to receiving a COVID-19 vaccine due to the usage of aborted fetal cell lines in the design and development process and/or contained in the mandated COVID-19 vaccines.

39.     Ms. Lively's religious belief system dictates that life begins at conception and that she cannot and should not inject a substance into her body that relied upon aborted fetal cells to exist.

40.     Ms. Lively has for years maintained religious objections to the practice of abortion.

41.     Ms. Lively opted to exclude explaining her religious objections to the use of aborted fetal cell lines in her written religious exemption request because she became aware that Defendant harbored particular distaste for persons who objected to compulsory vaccination based on religious objections to abortion.

42.     More specifically, one of her colleagues had requested religious accommodation based on objections to fetal cell involvement in the COVID-19 vaccines and was rejected and then subject to termination.

43.     Ms. Lively, therefore, self-censored her abortion-based objections based on a well-founded belief that Defendant would refuse to honor such religious objections and would terminate her if she disclosed such religious objections.

***Defendant's Non-Existent Accommodations Process and Pretextual Justifications for Terminating Plaintiff.***

44.     After Ms. Lively submitted her religious exemption request on December 15, 2021, on or about January 7, 2022, Defendant's HR representative spoke with Ms. Lively on the

7

telephone and further probed Ms. Lively on her sincere religious beliefs in conflict with the Mandate.

45.     In this phone call, Ms. Lively explained why and how her sincere religious beliefs conflicted with the Mandate.

46.     Defendant did not engage in any effort to determine whether there were accommodation options that would enable Ms. Lively, a high performing employee, to continue contributing to Defendant's business.

47.     Defendant denied Ms. Lively's religious exemption request by email dated January 24, 2022.[6]

48.     Ms. Lively submitted a letter from her minister in support of her religious exemption request in an attempt to appeal the decision.[7]

49.     Her minister confirmed that Ms. Lively has religious-based objections to receiving a COVID-19 vaccine.

50.     After considering Ms. Lively's religious exemption request and supporting documentation, and presumably factoring the reality that Ms. Lively was presently teleworking, Defendant denied her exemption and accommodation requests, explaining that "[A]fter reviewing what you submitted, we have decided that we will require you to comply with our policy by being fully vaccinated against COVID-19."[8]

51.     When informing Ms. Lively it would terminate her unless she violated her religious convictions, Defendant knew that the mandated vaccines did not prevent infection or transmission

---

[6] *See* Exhibit B, Defendant's Religious Accommodation Denial Letter.

[7] *See* Exhibit C, Letter from Plaintiff's Minister Affirming her Religious Sincerity.

[8] *See* Exhibit B.

8

of COVID-19 and as such, only provided a possible level of personal protection (which Ms. Lively gladly declined to preserve her religious integrity).

52.    When informing Ms. Lively they would terminate her if she held true to her religious convictions, Defendant pretextually justified the Mandate on "workplace safety" grounds: "And, as we prepare for employees to return to the office, we cannot understate the importance of being vaccinated to protect health and safety. It is critical that we all do what we can to raise our standards for a healthy workplace that have been jeopardized by COVID-19."[9]

53.    However, at the time Defendant sent this email, it knew that vaccinated employees were contracting COVID-19 at very high rates.

54.    Defendant also knew that employees who had been immunized naturally through prior infection and recovery possessed at least equivalent and likely greater protection against COVID-19 than employees who had been immunized artificially through vaccination. In the context of COVID-19, natural immunity's desirable relative efficacy when compared to immunity derived artificially through vaccination has been repeatedly confirmed in the scientific literature.[10]

55.    In fact, research from one of the world's most prestigious medical institutions—the Cleveland Clinic—has demonstrated that the risk of contracting COVID-19 *increases with the number of vaccine doses received.*[11]

---

[9] *Id.*

[10] *See, e.g.,* The Lancet, *Past SARS-CoV-2 infection protection against re-infection: a systematic review and meta-analysis* (Feb. 16, 2023), *available at* https://www.thelancet.com/article/S0140-6736(22)02465-5/fulltext

[11] *See* Nabin K. Shrestha *et. al.,* MedRxiv, *Effectiveness of Coronvirus Disease (COVID-19) Bivalent Vaccine,* (Dec. 19, 2022), *available at* https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1 (in comprehensive study, researchers found the risk "of COVID-19 increased with time since the most recent prior COVID-19 episode **and with the number of vaccine doses previously received**") (emphasis added).

9

56. Yet, Defendant refused to recognize natural immunity as satisfying its immunization requirement because it wanted to purge as many religious employees from its workforce as it possibly could.

57. Had Defendant announced it would have recognized natural immunity as satisfying its vaccination requirement, Ms. Lively would have been tested for COVID-19 antibodies and would thereafter have sought an accommodation on those grounds if she had proof of COVID-19 antibodies.

58. Defendant also knew the mandated vaccines were not safe by any reasonable or objective measure. Publicly available information during the relevant timeframes reported the very high rates of adverse events to the COVID-19 vaccines.

59. On belief, and consistent with publicly available information regarding high adverse event rates, Defendant's employees who had been vaccinated reported unacceptable rates of adverse events to receiving the mandated COVID-19 vaccines.

60. Nonetheless, in reckless disregard of her Title VII rights, Defendant terminated Ms. Lively on March 2, 2022, because she was unable to receive the mandated vaccines for religious reasons.

61. Defendant failed to engage in a genuine, good-faith interactive process to legitimately consider possible religious accommodations to the Mandate specifically for Ms. Lively.

62. Because they refused to engage in an interactive process, Defendant willfully disregarded the many accommodation options that would have posed minimal and/or non-existent burdens, including: (1) continuing the *status quo* of 100% remote work; (2) weekly testing for

COVID-19; (3) testing/masking when required to attend any hypothetical in-person meeting or interactions required by her job duties; or (4) any combination of the above.

63.     On information and belief, Defendant had actual knowledge that many of its unvaccinated employees had gained natural immunity through prior infection and recovery.

64.     On information and belief, Defendant had actual knowledge through internal tracking data that its vaccinated employees were still actively contracting and transmitting COVID-19 at very high rates during the relevant timeframes.

65.     Defendant knew or should have known that at best, the COVID-19 vaccine provided an undefined level of personal protection against COVID-19. Because of this scientific reality, which was well known in the scientific community and public at the time of the relevant events described herein, Defendant's proffered justification for the Mandate was disingenuous, at best.

66.     Defendant knew or should have known that unvaccinated employees provided no greater risk to anyone they came in contact with than the risk posed by vaccinated employees.

67.     Recognizing natural immunity likewise would have been a no-cost accommodation option, but this was never discussed with Ms. Lively.

68.     Defendant failed to probe Ms. Lively on the issue of whether she had natural immunity through prior infection because they did not engage in any interactive process with her to determine if a reasonable accommodation existed that would not cause Defendant substantial hardship.

*Defendant's Pretextual and Counterfactual Justifications for the Mandate and for Terminating Plaintiff.*

69.     When Defendant terminated Ms. Lively, it was abundantly clear that the available COVID-19 vaccines were ineffective at preventing infection and transmission of COVID-19, as Defendant's own business records will reveal.

70.     During the relevant timeframes, Defendant knew or should have known that for the months leading up to the mass termination of medically vulnerable and religious employees, that the overwhelming majority of employees during the relevant timeframes who reported a COVID-19 positive test were vaccinated.

71.     Similarly, Defendant knew or should have known at the time they terminated Ms. Lively that its vaccinated employees were contracting and spreading COVID-19 at the same, similar, or higher rates than its unvaccinated employees, especially those who possessed natural immunity. Defendant's own internal tracking data will reveal this reality.

72.     Therefore, the fact that Ms. Lively was not able to receive a COVID-19 vaccine due to her sincere religious beliefs posed no greater purported threat to any employee and/or client of Defendant than the threat posed by a vaccinated employee.

73.     Said differently, Ms. Lively's inability to receive a COVID-19 vaccine due to her sincere religious beliefs did not make her continued employment with Defendant a relatively greater purported threat to anyone's safety or well-being.

74.     Any assertion to the contrary is disingenuous given the publicly available information that Defendant knew or should have known at the time it terminated Ms. Lively.

75.     Publicly available information (news reports, published research, etc.,) during the relevant timeframes conclusively demonstrated that the COVID-19 vaccines were ineffective at preventing contraction and transmission of COVID-19.

12

76.     In fact, before Defendant instituted the Mandate, the CDC Director stated unequivocally that the vaccines were incapable of preventing transmission and infection. Director, Rochelle Walensky, stated that, while the COVID-19 vaccines appeared to work "with regard to severe illness and death—they prevent it. But what they can't do anymore is prevent transmission."[12]

77.     Thus, the COVID-19 vaccines that Defendant required as a condition of continued employment, at best, provided a potential and undefined level of personal protection.

78.     Whatever level of personal protection against COVID-19 that the vaccines hypothetically provided, any benefit of personal protection against COVID-19 was not as valuable to Ms. Lively as her sincerely held religious beliefs, as demonstrated by the fact she lost her career in order to preserve her religious beliefs.

79.     In contrast, any immunity derived artificially through vaccination has been demonstrated to wane dramatically. In fact, research from one of the world's most prestigious medical institutions—the Cleveland Clinic—has demonstrated that the risk of contracting COVID-19 *increases with the number of vaccine doses received.*[13]

**Defendant's Willful Disregard of Vaccine-Related Risks and Harms.**

80.     The Vaccine Adverse Event Reporting System ("**VAERS**") was established in 1990 and is overseen jointly by the CDC and the Food and Drug Administration ("**FDA**").

---

[12] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021).

[13] *See* Nabin K. Shrestha *et. al.,* MedRxiv, *Effectiveness of Coronvirus Disease (COVID-19) Bivalent Vaccine,* (Dec. 19, 2022), *available at* https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1 (in comprehensive study, researchers found the risk "of COVID-19 increased with time since the most recent prior COVID-19 episode ***and with the number of vaccine doses previously received***") (emphasis added).

13

81. VAERS provides a platform for individuals and healthcare providers to report adverse events to vaccines. The platform collects and aggregates the data of adverse events relating to all vaccines, including the COVID-19 vaccines.

82. As of October 26, 2021, the number of deaths reported to VAERS as a result of the COVID-19 vaccines totaled over 13,422, while the total number of reported deaths from 30 years of VAERS reporting for **all other vaccines** totaled 9,183. Meaning, in less than a full year of administration of the COVID-19 vaccines, there were over 4,000 more deaths reported after a COVID-19 vaccine than that for all vaccines administered over 30 years, combined.

83. In September of 2021, when Defendant was evaluating whether to mandate COVID-19 vaccines, there had been approximately 623,341 adverse events relating to the COVID-19 vaccines reported to VAERS. These adverse events included approximately: 13,627 COVID-19 vaccine related deaths, 55,821 COVID-19 vaccine related hospitalizations, 74,368 COVID-19 vaccine related urgent care visits, 17,794 COVID-19 vaccine related cases of permanent disability, and 14,105 other life-threatening COVID-19 vaccine related incidents.

84. On the date Defendant instituted the Mandate, VAERS data was publicly available and had been reported in the news.

85. On belief, Defendant's employees reported actual and possible adverse events related to the mandated COVID-19 vaccines to upper management.

86. Despite constructive and/or actual knowledge of suspected adverse events, and with actual knowledge that the mandated vaccines were not capable of preventing infection and transmission of COVID-19, Defendant instituted their COVID-19 vaccine requirement, communicated or otherwise indicated that the COVID-19 vaccines were "safe," and failed to inform employees of the risks associated with receiving the COVID-19 vaccine.

87. On the date Defendant terminated Ms. Lively, VAERS data was publicly available and had been reported in the news.

88. A federally-funded study evaluating the VAERS system was performed by Harvard Pilgrim Health Care, Inc., from December 2007, through September 2010, aggregating the medical records of 715,000 patients across the country, 376,452 of which were vaccine recipients. The study found that after comparing the medical records of vaccine recipients with the total number of events reported to VAERS, **less than 1% of the total number** of vaccine-induced adverse events were reported to VAERS.

89. The VAERS underreporting problem is supported by the CDC's own safety data related to the COVID-19 vaccines.

90. On or around December 13, 2020, the CDC introduced its smartphone-based program for COVID-19 vaccine recipients called "V-safe." The program allows for users to "quickly and easily share with CDC how you, or your dependent, feel after getting a COVID-19 vaccine."

91. Out of the 10,094,310 registered users who submitted data to V-safe, **782,913 users, over 7.7%, reported a health event requiring medical attention, emergency room intervention, and/or hospitalization.**

92. Over 25% of V-safe users had an event requiring them to miss school or work, and/or prevented normal activities.

93. Defendant's own business records will reflect that employees who received a COVID-19 vaccine experienced similar rates of adverse events revealed in the V-safe data.

94. In reckless disregard of Ms. Lively's rights under the Title VII, and the NCEEPA, Defendant refused to offer any of the many reasonable accommodation options available, despite

15

knowledge of her sincerely held religious beliefs that precluded her from receiving a COVID-19 vaccine.

***Events Following Ms. Lively's Termination***

95.    On March August 8, 2022, Ms. Lively filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("**EEOC**") alleging religious discrimination.

96.    Ms. Lively participated fully in the EEOC administrative process.

97.    On June 16, 2023, the EEOC concluded its investigation and issued Ms. Lively a Notice of Right to Sue.[14]

98.    Despite stating that COVID-19 vaccination was the only option to maintain workplace safety, less than a year later, Defendant no longer requires COVID-19 vaccination as a condition of employment. On January 1, 2023, Defendant officially rescinded the Mandate.

## V. CAUSES OF ACTION

### COUNT ONE
### TITLE VII
### RELIGIOUS DISCRIMINATION - FAILURE TO ACCOMMODATE
### 42. U.S.C. §2000(e), *et. seq.*

99.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

100.    Title VII of the Civil Rights Act of 1964, as amended in 1972, makes it unlawful for an employer to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a)(1).

101.    The statute states that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms,

---

[14] *See* Exhibit D, Susan Lively's Right to Sue Letter.

conditions, or privileges of employment, because of such individual's . . . religion[.]" *Id*. The term "religion" as used within Title VII includes "all aspects of religious observance and practice, as well as belief." *Id*.

102.    "Religion" is defined to include all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C.S. § 2000e(j). Because this definition includes a requirement that an employer "accommodate" an employee's religious expression, an employee is not limited to the disparate treatment theory to establish a discrimination claim.

103.    An employee can also bring suit based on the theory that the employer discriminated against her by failing to accommodate her religious beliefs. *See Chalmers v. Tulon Co.*, 101 F.3d 1012, 1014 (4th Cir. 1996).

104.    To establish a *prima facie* case of failure to accommodate a religious belief, a plaintiff must show that: (1) she holds a *bona fide* or otherwise sincere religious belief that conflicts with an employment requirement; (2) she has informed the employer about the conflict; and (3) she was discharged or disciplined for failing to comply with the conflicting employment requirement. *Id*. at 1019.

105.    Ms. Lively's beliefs are indeed sincere, as evidenced by her willingness to uphold her beliefs while threatened with the loss of her livelihood and career.

106.    In addition, Ms. Lively's beliefs against receiving a COVID-19 vaccine are based on her religious convictions.

107.    The "proper analysis of what constitutes a religious belief under Title VII is the same as that applied in the selective service cases." *EEOC v. Alliant Techsystems*, 1998 WL

777015, at *18-19 (W.D. Va. 1998) *(citing Welsh v. United States*, 398 U.S. 333, 26 (1970) and *United States v. Seeger*, 380 U.S. 163, 13 (1969)).

108. "[T]he belief must only 'stem from [the person's] moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions.'" *Id.* citing *Welsh*, 398 U.S. at 340.

109. "A plaintiff's religious beliefs 'need not be acceptable, logical, consistent, or comprehensible to others.'" *Id.* citing *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 714 (1981).

110. "The Supreme Court has made it clear that as long as a party's beliefs are religiously asserted, it is not for the courts to challenge the truthfulness of such assertions simply because they developed 'from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible.'" *Id.* citing *Hobbie v. Unemployment Comm'n of Fla.*, 480 U.S. 136, 144 n.9 (1987).

111. As a practicing Christian since age 25, Ms. Lively looks to the Holy Spirit for guidance in her life. Ms. Lively incorporates her Christian faith into her daily life through scripture and prayer. She is a member of Mountain Islands Church of Christ.

112. Ms. Lively made a conscious choice to follow the Lord when she was baptized into the Church at the age of 25. Ms. Lively later served as a short-term missionary at various times between 2008 and 2012.

113. Ms. Lively's sincerely held beliefs are not mere preferences, but rather part of a comprehensive belief system, which guides daily decision making for matters both large and small.

114. In personal system of religious beliefs, undergoing a medical procedure tainted with abortion and that would potentially fundamentally alter her body as originally designed by God

18

was a major life decision having serious and fundamental religious implications. Accordingly, Ms. Lively prayed about whether to receive a COVID-19 vaccine and was convicted that she must not.

115.    Ms. Lively timely submitted her religious exemption request, informing Defendant of how her sincerely held religious beliefs preclude her from receiving a COVID-19 vaccine.

116.    Defendant denied Ms. Lively exemption and religious accommodation request. Defendant did not engage in any interactive process with Ms. Lively to determine if it was possible to accommodate her clearly stated religious objections.

117.    Ms. Lively attempted to appeal the decision and provided a supporting letter from her Minister, Joe Williams of Mountain Island Church of Christ. In his letter, Mr. Williams attested that Ms. Lively's objections were indeed sincere and detailed the Biblical basis for Ms. Lively's objections to receiving a COVID-19 vaccine.[15] Minister Williams then urged Defendant to "reconsider [its] decision" to deny Ms. Lively's religious exemption request.[16]

118.    Defendant denied Ms. Lively's religious exemption request on January 24, 2022.

119.    Because there were multiple no-cost and low-cost accommodation options available, Defendant could have accommodated Ms. Lively without undue hardship.

120.    "Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant employer to show that it could not reasonably accommodate the employee without undue hardship" *Id*.

121.    The Supreme Court's recent ruling in *Groff v. DeJoy, Postmaster Gen*., 143 S. Ct. 2279 (2023) makes clear that an "employer must show that the burden of granting an

---

[15] *See* Exhibit C, Letter from Plaintiff's Minister detailing Plaintiff's Religious Sincerity.
[16] *Id*.

accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at *2295 (internal citations omitted).

122.  When evaluating whether an accommodation would constitute an undue burden, employers must take "into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer." *Id.* Thus, "courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.*

123.  Defendant is a large and sophisticated organization and manages more than a trillion dollars in investments. Defendant has substantial resources and as such is able to accommodate its religious employees to a greater degree and with less burden than employers with fewer resources.

124.  Moreover, because Ms. Lively was teleworking when terminated, accommodating her religious beliefs would not have impacted the conduct of Defendant's business. "Title VII requires an assessment of a possible accommodation's effect on 'the conduct of the employer's business."" *Groff,* 143 S. Ct. at 2295. Relatedly, "not all 'impacts on coworkers . . . are relevant," but only "coworker impacts" that go on to "affec[t] the conduct of the business."" *Id.* Moreover, "some evidence that occasionally is used to show 'impacts' on coworkers is 'off the table' for consideration." *Id.* "Specifically, a coworker's dislike of 'religious practice and expression in the workplace' or 'the mere fact [of] an accommodation' is not 'cognizable to factor into the undue hardship inquiry.'" *Id.* As such, an "employer who fails to provide an accommodation has a defense only if the hardship is 'undue,' and a hardship that is attributable to employee animosity

20

Case 3:23-cv-00582-FDW-SCR   Document 1   Filed 09/13/23   Page 20 of 29

to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" *Id.*

125.     On belief, showing its preference for secular above religious, Defendant accommodated employees who sought medical exemptions at higher rates than employees who sought religious accommodations, further evidencing its motivation to avoid accommodating on the basis of religious objections to vaccination. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) (holding that Title VII's "disparate-treatment provision prohibits actions taken with the *motive* of avoiding the need for accommodating").

126.     Defendant could have accommodated Ms. Lively, *inter alia*, through: (1) continuing the status quo of 100% remote work; (2) weekly testing for COVID-19; (3) testing/masking when required to attend any hypothetical in-person meeting or interactions required by her job duties; or (4) any combination of the above.

127.     With the available accommodations listed above, Ms. Lively would have been able to continue performing the essential functions of her job with little or no burden to Defendant.

128.     Defendant refused to consider, much less provide, any of the above-referenced or accommodations options for Ms. Lively.

129.     Instead, Defendant terminated Ms. Lively for choosing to uphold her religious convictions.

130.     Because her sincere religious beliefs precluded Ms. Lively from receiving one of the COVID-19 vaccines, and in light of the fact Defendant knew that the required vaccines were incapable of preventing infection and transmission, but would violate Ms. Lively's sincerely held religious beliefs, Defendant's actions were in reckless disregard of Ms. Lively's rights under Title VII.

21

131. As a result of Defendant's unlawful actions, Ms. Lively has suffered emotional and psychological distress from the loss of her career and the months of uncertainty and repeated coercion to disregard her bona fide religious beliefs in order to preserve her livelihood and career. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

132. As a result of Defendant's unlawful actions, Ms. Lively has also suffered financial harm including loss of health insurance, employee assistance program, short, and long-term disability insurance, company matched retirement, life insurance, and accidental death insurance.

133. Defendant's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Ms. Lively's rights under Title VII. As a direct and proximate result of TIAA's discriminatory treatment, Ms. Lively has suffered, and continues to suffer, economic, pecuniary damages for which she is entitled to judgment.

134. The foregoing conduct constitutes illegal, and intentional failure to accommodate that is prohibited under 42 USC § 2000e-2 *et seq*.

135. As a direct and proximate result of the discriminatory treatment, Ms. Lively has suffered, and continues to suffer, the damages hereinafter described. Accordingly, Ms. Lively requests relief as hereinafter described.

## COUNT TWO
### TITLE VII - RELIGIOUS DISCRIMINATION - DISPARATE TREATMENT
### 42 U.S.C 2000e-2(a)(1)

136. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

137. Ms. Lively can also demonstrate a *prima facie* case for religious discrimination under a disparate treatment theory.

138. A *prima facie* case for disparate treatment requires the plaintiff to show: (1) she is a member of a protected class, (2) satisfactory job performance (3) she suffered an adverse employment action, and (4) that she was treated differently than similarly situated employees outside the protected class. *See Abeles v. Metro. Wash. Airports Auth.*, 676 F. App'x 170, 171 (4th Cir. 2017), citing *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

139. As a practicing Christian who notified Defendant of her religious conflict with the Mandate, including a supporting letter from her minister verifying her religious sincerity, Ms. Lively is a member of a protected class.

140. As demonstrated by her strong performance record, including throughout the pandemic, Ms. Lively was qualified for her job.

141. Ms. Lively suffered adverse employment action when she requested religious accommodation to the Mandate and was denied and then terminated for upholding her religious beliefs.

142. Defendant treated secular employees, with no religious conflict with the Mandate, more favorably than those religious employees with a religious conflict with the Mandate.

143. Defendant permitted secular employees with no religious objections to vaccination to continue teleworking after it terminated Ms. Lively.

144. The circumstances give rise to a strong inference of discriminatory intent. Defendant had actual knowledge that the mandated vaccines were incapable of preventing infection or transmission, and, at best, provided an undefined level of personal protection.

Defendant also knew that its vaccinated employees were contracting COVID-19 at very high rates during the relevant timeframes.

145. Defendant also knew that requiring Ms. Lively to comply with the Mandate would force her to violate her religious beliefs.

146. Ms. Lively gladly declined any hypothetical personal protection the COVID-19 vaccines may have provided in order to preserve her religious convictions.

147. On belief, Defendant filled Ms. Lively's job with an employee who did not have religious objections to receiving a COVID-19 vaccine.

148. Defendant's justifications for terminating Ms. Lively are pretext.

149. Any reasons asserted in support of Defendant's termination of Ms. Lively were pretextual because Ms. Lively was working remotely and was performing her essential job functions at a high level when Defendant terminated her. She could have continued to do so.

150. Furthermore, the publicly available data that the vaccines were incapable of preventing infection or transmission, or at least providing some defined level of protection, further demonstrates Defendant's disingenuous justification behind implementing, maintaining, and enforcing the Mandate against religious employees. If workplace safety was truly its intention, Defendant would have accepted natural immunity as satisfying the Mandate's requirements (which it did not), would have informed its employees of the safety risks associated with the COVID-19 vaccines, and would have required its vaccinated employees, who were contracting COVID-19 at high rates during the relevant timeframes to adhere to enhanced safety protocols to ensure they did not spread the virus.

151. Therefore, considering these factors, Ms. Lively was terminated "because of" her religious beliefs.

152.    The aforementioned conduct is prohibited under Title VII and constitutes a violation of the same.

153.    In addition to financial loss, Ms. Lively suffered emotional and psychological harm from the months of uncertainty and repeated coercion to disregard her bona fide religious beliefs in order to preserve her livelihood and career.  As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

154.    Ms. Lively seeks back pay, interest on back pay, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and punitive damages.

155.    All of the aforementioned damages were actually and proximately caused by Defendant's violation of Title VII.

156.    As a direct and proximate result of the discriminatory treatment, Plaintiff has suffered, and continues to suffer, the damages hereinafter described.

157.    Accordingly, Ms. Lively requests relief as hereinafter described.

**COUNT THREE**
**WRONGFUL DISCHARGE**
**NORTH CAROLINA EQUAL EMPLOYMENT PRACTICES ACT**
**(N.C. Gen. Stat. Ann. § 143-422.2)**

158.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as fully set forth herein.

159.    As a general matter, North Carolina is an at-will employment state. This means that employers and employees may terminate their employment relationship at any time. *See Still v. Lance*, 279 N.C. 254, 182 S.E.2d 403 (1971).

25

160.     A narrow public policy exception to this employment-at-will doctrine exists in the tort of wrongful discharge in violation of public policy. There can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. *See McKinney v. N. Telecom*, CIVIL NO. 1:91CV00426, 1992 U.S. Dist. LEXIS 21948, at \*1 (M.D.N.C. Sep. 24, 1992).

161.     There is no outlined private right of action under the North Carolina Equal Employment Practices Act ("**NCEEPA**"), however, plaintiffs can properly allege a wrongful discharge in violation of a public policy that is anti-discriminatory under the Act. *See Jackson v. Blue Dolphin Communs. of N.C., L.L.C.*, 226 F. Supp. 2d 785, 2002 U.S. Dist. LEXIS 19337 (W.D.N.C. 2002).

162.     "It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees" *Id.*

163.     Defendant is a sophisticated corporation employing well over 15 employees and is therefore subject to the public policy set forth under the NEEPA.

164.     Defendant is subject to penalties for wrongful discharge under the NEEPA for violations of North Carolina's anti-discriminatory public policy.

165.     As detailed above and throughout this Complaint, Defendant violated Title VII by engaging in religious discrimination and failing to accommodate Ms. Lively's religious beliefs.

166.     The aforementioned conduct is prohibited under Title VII and constitutes a violation of same, and therefore, violates the NCEEPA.

167.    In addition to financial loss, Ms. Lively suffered emotional and psychological harm from the months of uncertainty and repeated coercion to disregard her bona fide religious beliefs in order to preserve her livelihood and career.  As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

168.    Ms. Lively seeks back pay, interest on back pay, the value of back benefits, and front pay all through the date of trial, attorney fees, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses and punitive damages.

169.    All of the aforementioned damages were actually and proximately caused by Defendant's violation of Title VII and the NCEEPA.

170.    As a direct and proximate result of the discriminatory treatment, Plaintiff has suffered, and continues to suffer, the damages hereinafter described. Accordingly, Ms. Lively requests relief as hereinafter described.

## VII.PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, awarding relief as follows:

a) Declare that Defendant violated Title VII by failing to provide a reasonable accommodation to Ms. Lively's sincerely held religious beliefs when numerous no-cost and low-cost options were available;

b) Declare that Defendant violated Title VII by terminating Ms. Lively "because of" her sincerely held religious beliefs;

c) Declare that Defendant violated the NEEPA by wrongfully discharging her in violation of Title VII;

d) Award Ms. Lively damages, which exceed $100,000.00, including back pay, front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

e) Award Ms. Lively damages necessary to make her whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial;

f) Award Ms. Lively damages for severe emotional distress that resulted from Defendant's unlawful actions;

g) Award Ms. Lively reasonable attorneys' fees and costs;

h) Issue a permanent injunction requiring Defendant to expunge Ms. Lively's personnel files of any derogatory, false, or misleading information relating to this matter;

i) Order Defendant to provide training for supervisors and managers at all corporate levels specific to Title VII's requirements regarding religious discrimination;

j) Order Defendant to provide training for supervisors and managers at all corporate levels specific to the NCEEPA; and

k) Grant any other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all counts so triable.

Dated:   September 13, 2023                    Respectfully submitted,


                                               SIRI | GLIMSTAD, LLP


                                               */s/ Dana Smith*
                                               Dana Smith, Attorney
                                               525 North Tryon Street
                                               Suite 1600, #7433
                                               Charlotte, North Carolina 28202
                                               Phone: (980) 448-1299
                                               Facsimile: 646-417-5967
                                               dsmith@sirillp.com

                                               Walker Moller*
                                               SIRI | GLIMSTAD LLP
                                               501 Congress Avenue
                                               Suite 150-#343
                                               Austin, Texas 78701
                                               Main: 512-265-5622
                                               Facsimile: 646-417-5967
                                               wmoller@sirillp.com

                                               Jack R. Spitz*
                                               SIRI | GLIMSTAD LLP
                                               8 Campus Drive, Suite 105 PMB#161
                                               Parsippany, New Jersey 07054
                                               Main: 212-532-1091
                                               Facsimile: 646-417-5967
                                               jspitz@sirillp.com

                                               *Counsel for Plaintiff*

                                               * *Pro Hac Vice Motion forthcoming*